Matthew J. Langley (SBN 342286)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354
matt@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: (708) 437-6476
david@almeidalawgroup.com

*Attorneys for Plaintiff & the Putative Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARVEY BRENNEISE*, individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>vs.<br><br>AIOS, INC., d/b/a FELLA HEALTH *and* d/b/a DELILAH *and* FELLA MEDICAL GROUP, P.A.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CALIFORNIA PENAL CODE §631, *ET SEQ.*;<br>2. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CALIFORNIA PENAL CODE §632, *ET SEQ.*;<br>3. VIOLATION OF THE ELECTRONIC COMMUNICATION PRIVACY ACT, 18 U.S.C. §2510, *ET SEQ.*;<br>4. VIOLATION OF THE WASHINGTON PRIVACY ACT, RCW 9.73.030 *ET SEQ.*;<br>5. VIOLATION OF THE MY HEALTH, MY DATA ACT, RCW 19.373, *ET SEQ.*;<br>6. UNJUST ENRICHMENT.<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Harvey Brenneise, individually and on behalf of all others similarly situated, brings this class action lawsuit against Aios, Inc., d/b/a Fella Health and d/b/a Delilah ("Aios") and Fella Medical Group, P.A. ("Fella Medical") (together, "Defendants"), and alleges, upon personal knowledge as to his own actions and his counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This class action lawsuit addresses Defendants' improper, unauthorized, and illegal disclosure of users' personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third-party advertising platforms and data analytics companies without those users' knowledge or consent.

2.    Defendant Aios, Inc., d/b/a Fella Health and d/b/a Delilah ("Aios") owns, maintains, and controls two websites: fellahealth.com and joindelilah.com, which are substantially identical websites targeted at men and women, respectively, interested in weight loss (collectively, the "Websites").

3.    Defendant Fella Medical Group, P.A. ("Fella Medical") is a Florida professional corporation that provides medical services to users of the Websites, including prescribing GLP-1 medications. Through the Websites and Fella Medical's telehealth platform, users solicit approval of GLP-1 regimens and access to GLP-1 products.

4.    Given their solicitation, acquisition and retention of sensitive medical data and provision of healthcare services, Defendants have an obligation to protect the privacy and confidentiality of their user's Private Information in their possession.

5.    This obligation is not merely ethical—it is mandated by federal and state law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

1

**CLASS ACTION COMPLAINT**

6. Defendants acknowledge their legal obligation to protect their users' PHI, stating: "[w]ithout your authorization, we are expressly prohibited from using or disclosing your protected health information for marketing purposes. We may not sell your protected health information without your authorization."[1] Defendants also claim that they have "elected to voluntarily substantially comply with the standards set forth in HIPAA."[2]

7. Despite these obligations and promises, Defendants have systematically violated their users' privacy rights by deploying sophisticated tracking technologies throughout the Websites and telehealth platforms. These technologies include tracking pixels from X (formerly Twitter) and Quora, each of which surreptitiously captures and transmits Private Information to third parties in real-time.

8. The tracking mechanisms employ techniques such as click ID tracking, which creates unique identifiers that follow users across browsing sessions; "advanced matching" capabilities that link anonymous browsing data to identifiable user profiles through hashed email addresses and other personal identifiers; conversion tracking that monitors every step of a user's journey from initial ad click through medical consultation and prescription purchase; and persistent browser storage mechanisms that maintain tracking even after users believe they have ended their session.

9. These pixels capture granular details including medical questionnaire responses, prescription requests, weight and health metrics, and other sensitive medical data—all transmitted to advertising platforms where this information is used

---

[1] *Fella Notice of Privacy Practices*, https://www.fellahealth.com/privacy-practices (last accessed Nov. 10, 2025).

[2] *Privacy Practices*, https://www.fellahealth.com/privacy-practices (last accessed Nov. 10, 2025).

**CLASS ACTION COMPLAINT**

for targeted advertising, user profiling, data brokering, and other commercial purposes entirely unrelated to the provision of healthcare services.

10. These disclosures occur without the users' knowledge, consent, or authorization, in direct violation of federal and state privacy laws.

11. When users seek medical care through the Websites and Fella Medical's services, they reasonably expect that their sensitive health information—including weight, prescription medications, and medical histories—will remain confidential between them and their healthcare providers.

12. Plaintiff brings this class action lawsuit on behalf of himself and classes of similarly situated persons to secure redress for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.; (ii) violations of the California Invasion of Privacy Act, Cal. Penal Code § 631; (iii) violations of the California Invasion of Privacy Act, Cal. Penal Code § 632; (iv) violations of the Washington Privacy Act, RCW 9.73.030; (v) violations of the My Health My Data Act, RCW 19.373 *et. seq*; and (vi) unjust enrichment.

## PARTIES

13. Plaintiff Harvey Brenneise is an adult citizen who lives, and at all relevant times has lived, in Sedro-Woolley in Washington 98284.

14. Defendant Aios, Inc. is a public corporation incorporated and existing under the laws of the State of Delaware with its principal place of business located at 101 Mission Street, Suite 800 in San Francisco, California 94105.

15. Defendant Fella Medical Group, P.A. is a Florida professional corporation with its principal place of business located at 2261 Market Street, Suite 4540 in San Francisco, California, 94114.

## JURISDICTION & VENUE

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action lawsuit wherein the amount in controversy

3

CLASS ACTION COMPLAINT

exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class (e.g., Plaintiff) is a citizen of a state different from either Defendant.

17. This Court has personal jurisdiction over Defendants because Defendants are headquartered in San Francisco, California, and conduct significant operations in this judicial District.

18. Venue is proper under 28 U.S.C § 1391(b) because Defendants are headquartered in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

## I. GLP-1 USERS ARE PARTICULARLY LIKELY TO BE SUBJECTED TO DATA TRACKING.

19. The market for glucagon-like peptide-1 (GLP-1) medications has experienced explosive growth in recent years, with approximately 20 million Americans using drugs like Wegovy, Ozempic, Mounjaro, and Zepbound for weight loss and diabetes management.[3]

20. Companies like Ro, Hims & Hers, Calibrate, Noom, and others offer virtual prescriptions and access to these medications.[4] These telehealth companies rely heavily on digital advertising for customer acquisition, leading them to

---

[3] Gabby Landsverk, *A Guide to Navigating the Wild West of the Online GLP-1 Market,* MEN'S HEALTH (July 2, 2025), https://www.menshealth.com/health/a65013285/online-glp-1-market/.

[4] Katie Palmer, *How Digital Health Companies Are Capitalizing on the GLP-1 Boom*, CNBC (May 25, 2024), https://www.cnbc.com/2024/05/25/digital-health-companies-are-launching-programs-around-glp-1s-.html.

**CLASS ACTION COMPLAINT**

extensively deploy website tracking technologies to measure advertising effectiveness and retarget prospective patients.[5]

21. A December 2022 investigation by *The Markup* and STAT News examined 50 direct-to-consumer telehealth companies and found that 49 had third-party tracking code with the potential to share sensitive health data with technology platforms.[6]

22. On 13 websites, trackers from Meta, Google, TikTok, and other platforms collected patients' answers to medical intake questions about health conditions, medications, and treatment needs.[7]

23. On 25 telehealth sites—including those operated by Hims & Hers, Ro, and Thirty Madison—tracking codes informed tech platforms when users added prescription medications to shopping carts or completed treatment subscriptions.[8]

24. Recognizing the sensitivity of the data shared on telehealth sites and the potential for misuse of this information, federal regulators have aggressively pursued telehealth companies for improper data sharing.

---

[5] Emily Baumgaertner, *Cerebral, Telehealth Startups Face Privacy Pushback over Ad Models*, STAT NEWS (Mar. 22, 2023), https://www.statnews.com/2023/03/22/cerebral-lawsuit-privacy/.

[6] Todd Feathers, *et al.*, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[7] *Id.*

[8] *Id.*

**CLASS ACTION COMPLAINT**

25.    The FTC, for example, has reached major settlements with BetterHelp ($7.8 million for sharing mental health data with Facebook, Snapchat, and Pinterest),[9] GoodRx ($1.5 million for sharing prescription data with Facebook and Google),[10] and Cerebral (affecting 3.1 million patients whose data was shared with Meta, Google, and TikTok).[11]

26.    In July 2023, the FTC and HHS Office for Civil Rights jointly warned 130 hospital systems and telehealth providers about privacy risks from tracking technologies.[12]

27.    In December 2022, HHS confirmed that HIPAA prohibits regulated entities from using tracking technologies that result in impermissible PHI disclosures

[9] *Fed. Trade Comm'n, FTC Proposed Order Prohibits BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others* (Mar. 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-proposed-order-prohibits-betterhelp-revealing-consumers-data-including-sensitive-mental-health.

[10] *Fed. Trade Comm'n, FTC Enforcement Action Bars GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bars-goodrx-sharing-consumers-sensitive-health-info-advertising.

[11] *Pixel Use Results in Impermissible Disclosure of the PHI 3.1 Million Cerebral Platform Users*, HIPPA JOURNAL (Mar. 13, 2023), https://www.hipaajournal.com/cerebral-impermissible-disclosure-pixel-3170000/.

[12] *Fed. Trade Comm'n, FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

6

**CLASS ACTION COMPLAINT**

to vendors without Business Associate Agreements, which Meta, Google, and other ad platforms refuse to sign.[13]

28. Despite these enforcement actions, telehealth providers continue to extract and sell user data to third parties for advertising purposes, exploiting the popularity of their products and the sensitivity of their customers' needs in order to profit through undisclosed third-party advertising integrations.

## II. PLAINTIFF'S AND CLASS MEMBERS' PRIVATE INFORMATION IS EXTREMELY VALUABLE.

29. Medical and health data is one of the most valuable commodities in the digital economy. Industry analysts estimate that the global healthcare data market exceeded $34 billion in 2022 and is projected to reach $105 billion by 2030, representing a compound annual growth rate of over 15%.[14]

30. Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[15]

31. Within the healthcare data ecosystem, health information commands exceptional value due to its predictive power and marketing utility.

[13] Use Of Online Tracking Technologies By HIPAA Covered Entities and Business Associates (Dec. 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[14] *See Healthcare Analytics Market To Reach $167.0 Billion By 2030*, https://www.grandviewresearch.com/press-release/global-healthcare-analytics-market (last accessed July 17, 2025).

[15] *See* Herjavec Group*, 2021-2022 Healthcare Cybersecurity Report*, https://3447277.fs1.hubspotusercontent-na1.net/hubfs/3447277/2021-Healthcare-Cybersecurity-Report.pdf (last accessed July 17, 2025).

**CLASS ACTION COMPLAINT**

32.    Data brokers specifically seek health data because it reveals emotional vulnerabilities that can be exploited for hyper-specific targeted advertising, among many other things.

33.    A 2021 study by Duke University's Cyber Policy Program found that data brokers actively collect and sell health information with some brokers offering lists of individuals with specific conditions like depression, anxiety, or bipolar disorder for targeted marketing campaigns.[16]

34.    The commercial exploitation of health data has documented harmful consequences as individuals identified as having mental health conditions may be targeted by deleterious and exploitative advertising.[17]

35.    Third-party data brokers that are embedded in health apps and websites are extremely interested in this valuable data, which they use to create detailed profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[18]

---

[16] *See* Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals*, https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf (last visited Nov. 10, 2025).

[17] *See Electronic Privacy Information Center, A Health Privacy 'Check-Up': How Unfair Modern Business Practices Can Leave You Under-Informed and Your Most Sensitive Data Ripe for Collection and Sale,* https://epic.org/a-health-privacy-check-up-how-unfair-modern-business-practices-can-leave-you-under-informed-and-your-most-sensitive-data-ripe-for-collection-and-sale/ (last visited Nov. 10, 2025)

[18] *Id.*

**CLASS ACTION COMPLAINT**

## III. USERS' SENSITIVE INFORMATION, INCLUDING MEDICAL DATA, IS SOLICITED BY AND DIVULGED TO DEFENDANTS THROUGH THEIR WEBSITES.

### A. Background on Tracking Tools Used on the Website.

36. Defendants own and operate the Websites as telehealth platforms that provide virtual weight loss consultations and prescription services for weight management medications. Defendant Fella Medical provides medical services, including prescribing medications, to users of the Websites.

37. Thousands of people rely on Defendants and their services, including the Websites, as their primary conduit to weight loss treatment and related health services.

38. The Websites are marketed as offering specialized weight loss programs with access to prescription medications like GLP-1 agonists, with Fella Health targeting male users and Delilah targeting female users for weight management solutions.

39. The Fella Health and Delilah services offered by the Websites purport to include: (a) online consultations with healthcare providers; (b) prescription weight loss medications; (c) ongoing weight management support; and (d) personalized treatment plans based on individual health profiles.

40. Thousands of individuals rely on Defendants and their services as their primary means of accessing weight loss healthcare services. Defendants' services operate on subscription models with various pricing tiers for consultations and ongoing medication management.

41. The Websites have achieved significant market penetration in the rapidly growing telehealth weight loss market, capitalizing on demand for GLP-1 medications and other weight loss treatments.

42. Defendants market the Websites as providing confidential, personalized weight loss solutions and emphasize the private nature of their healthcare services.

9

**CLASS ACTION COMPLAINT**

43.   Unlike traditional healthcare providers who collect patient information after establishing a provider-patient relationship, the Websites require users to submit detailed health information through comprehensive onboarding quizzes before they can create an account, review any privacy policies, or access services.

44.   The Websites contain numerous first- and third-party tracking implementations that measure and record user data. These tracking technologies, including advertising pixels from Twitter and Quora, are embedded throughout the Websites' onboarding processes.

### i.   *Background on Twitter's Web Tracking Activities.*

45.   Twitter, Inc., now operating as X Corp. ("Twitter", "X" or "Twitter"), has evolved from a microblogging platform into a sophisticated digital advertising network deploying comprehensive tracking technologies across third-party websites.

46.   Through its rebranding and restructuring, Twitter has expanded its data collection capabilities while maintaining and enhancing the tracking infrastructure originally developed as Twitter.[19]

47.   Twitter provides website operators with a suite of tracking and analytics tools, including the Twitter Pixel, X Ads Manager, Conversion API, and third-party tag integrations.[20]

48.   These tools enable website operators to monitor user behavior, track conversions, build retargeting audiences, and optimize advertising campaigns based on detailed user profiles.[21]

---

[19]   *Conversion tracking for websites, X Business Help*, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites.

[20] *Id.*

[21] *Id.*

**CLASS ACTION COMPLAINT**

49. The Twitter Pixel consists of two primary components that must work together for full tracking functionality: the Base Code and Event Code. The Base Code "should be implemented across all pages of your site" and serves as the foundation for tracking "all traffic and upper funnel events such as site visits and landing page views."[22]

50. Without this Base Code installed on every page, website operators cannot access what Twitter describes as "the full functionality of Conversion Optimization and Dynamic Product Ad solutions."[23]

51. Beyond the Base Code, Twitter requires website operators to install Event Code on specific pages where conversion events occur, tracking actions such as purchases, sign-ups, add-to-cart events, and content views.

52. These Event Codes capture granular details about user interactions and transmit them to X's servers in real-time, creating comprehensive profiles of user behavior across websites.[24]

53. Twitter also implements a particularly invasive tracking mechanism called Click ID, which the platform describes as "a unique identifier that is automatically appended in the URL to help improve our ability to attribute site actions."[25]

---

[22]    *X    Pixel    Helper,    X    Business    Help*, https://business.x.com/en/help/troubleshooting/faqs-about-pixels.

[23]    *Conversion    tracking    for    websites,    X    Business Help*https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites.

[24] *Id.*

[25]    *About    Conversion    Tracking*,    https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites/about-conversion-tracking.

11

**CLASS ACTION COMPLAINT**

54. When users click on Twitter advertisements, this Click ID parameter (labeled "twclid") is embedded in the URL and stored using first-party cookies on the website, allowing Twitter to track all subsequent user actions even after the initial click.

55. Acknowledging that "third-party cookies are no longer supported by many browsers and are declining in usage," Twitter has deliberately implemented first-party cookie support to circumvent these privacy protections.[26]

56. By utilizing first-party cookies, Twitter admits it "is able to match and attribute more conversions than with third-party cookies," effectively bypassing browser-based privacy measures that users have enabled.[27]

57. The platform's documentation explicitly states that the "Allow 1st-party cookies" option is "default on" and is "required to access the full functionality" of Twitter's advertising products.[28]

58. This first-party cookie stores the Click ID parameter "in order to measure the conversion events that take place on your website," creating a persistent tracking mechanism that follows users throughout their browsing session.[29]

59. X's pixel tracking extends beyond cookies through its Conversion API, which enables "server-to-server integration" that completely bypasses browser-based privacy controls.[30]

---

[26] *Id.*

[27] *Id.*

[28] *Conversion tracking for websites,* https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites

[29] *Id.*

[30] *Id.*

**CLASS ACTION COMPLAINT**

60. This server-side tracking ensures that even users who have blocked JavaScript, disabled cookies, or installed ad blockers can still be tracked, as the data transmission occurs directly between website servers and Twitter's servers without any client-side interaction.

61. X's tracking capabilities also permit collection of multiple personally identifiable information types. The platform's Conversion API documentation reveals that Twitter collects and processes hashed email addresses, hashed phone numbers, IP addresses, user agent strings, and the Click ID for user matching and attribution.[31]

62. According to Twitter's technical documentation, email addresses must be "normalized and, when required, hashed to protect privacy" using SHA256 encryption before transmission.[32] Phone numbers must be formatted using the E164 Standard and similarly hashed.[33]

63. However, Twitter notes that "passing more identifiers will yield a higher conversion matching rate," incentivizing website operators to collect and transmit as much personally identifiable information as possible.[34]

64. The platform explicitly requires certain combinations of identifiers for tracking to function. As Twitter's documentation states, "The IP Address is required to be passed in conjunction with another identifier (twclid, email address, phone number or user agent)."[35]

---

[31] *Web conversions*, https://docs.x.com/x-ads-api/measurement/web-conversions.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

13

**CLASS ACTION COMPLAINT**

65.    This requirement ensures that Twitter can correlate multiple data points to create comprehensive user profiles even when individual identifiers might be insufficient for tracking.

66.    X's tracking platform employs a sophisticated dual-layer identification system that extends its tracking reach far beyond its own user base. For users logged into Twitter accounts, the platform's pixels automatically identify individuals through first-party cookies and the Click ID (twclid) parameter that persists across browsing sessions—when these users visit websites with Twitter Pixels installed, their activity is immediately linked to their Twitter accounts without requiring any additional configuration by the website operator.[36]

67.    However, Twitter's tracking infrastructure is designed to capture individuals regardless of whether they have Twitter accounts. The platform's Conversion API documentation explicitly details how website operators can transmit additional identifiers including hashed email addresses, hashed phone numbers (in E164 format), IP addresses (when paired with another identifier), and user agent strings.[37]

68.    Even individuals who have never created Twitter accounts can still be tracked and identified when they provide their email or phone number for any purpose if the website transmits this information to X. This creates a comprehensive tracking network where both Twitter users and non-users alike can be monitored across the web through multiple identification vectors.

69.    Like other tracking pixels, Twitter's technology operates invisibly to users. The pixel consists of JavaScript code that website operators embed in their

[36] *Web conversions*, X Developer Documentation, https://docs.x.com/x-ads-api/measurement/web-conversions (describing Click ID parsing and user matching).

[37] *Id.*

14

**CLASS ACTION COMPLAINT**

HTML, which loads automatically when users visit pages without any visible indication.[38] Users have no way of knowing their behavior is being monitored, their email addresses are being collected, or their interactions are being transmitted to Twitter's servers.

70.    Twitter's tracking extends well beyond the initial interaction through configurable attribution windows. The platform offers "post-engagement attribution windows" of up to 90 days, meaning that user actions can be tracked and attributed to Twitter advertisements for three months after any interaction.[39]

71.    During this extended period, all user behavior on websites with Twitter Pixels installed is monitored and linked back to their initial engagement with Twitter advertisements.

72.    The Twitter Pixel's Event Code can be configured to capture custom input data entered by users on a website, including names, email addresses, and phone numbers.[40]

73.    As Twitter's official business documentation confirms, "We also support user parameters, that allow you to pass additional hashed data to improve measurement coverage. Currently, we offer the ability to pass back email addresses and phone numbers, either via the Twitter Pixel or Conversions API."[41]

---

[38] *How to Set Up a Twitter Pixel to Optimize Your Ad Campaigns*, July 20, 2025, https://amasty.com/blog/what-is-twitter-pixel/.

[39]    *Conversion    Tracking*,    https://developer.x.com/en/docs/x-ads-api/measurement/web-conversions/overview

[40]    *Conversion    tracking    for    websites,    X    Business*, https://business.twitter.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites.html

[41] *Id.*

**CLASS ACTION COMPLAINT**

74. Website operators implement custom parameters within the Event Code to transmit user-submitted information directly to Twitter's servers whenever users interact with forms, input fields, or other data collection elements on the site.

75. This functionality enables Twitter to receive and process sensitive personal information beyond standard behavioral tracking metrics, creating detailed user profiles that link specific individuals to their browsing activities and on-site interactions.

76. Such custom data collection occurs automatically upon user interaction with the configured elements, allowing website operators to capture plain-text data through the Twitter Pixel's Event Code.[42]

77. This data is then transmitted to Twitter's servers where it can be used for user identification, ad targeting, and audience building purposes. Users entering their email address or phone number into a website form have no indication that this information will be simultaneously captured by Twitter's tracking technology and shared with the social media platform for advertising purposes.

78. X's comprehensive tracking infrastructure—combining Base Code on every page, Event Codes for specific actions, Click ID tracking, first-party cookies, server-side APIs, and multiple personally identifiable information types—creates an environment where sensitive user data can be easily collected and transmitted to Twitter's servers, particularly when deployed on websites handling health, financial, or other sensitive information.

### ii.    Background on Quora's Web Tracking Activities.

79. Quora, Inc. ("Quora") operates a question-and-answer platform that positions itself as a trusted source for knowledge sharing and information discovery. The platform has expanded beyond its original mission to become a significant

---

[42] *Id.*

16

**CLASS ACTION COMPLAINT**

participant in the digital advertising ecosystem, deploying sophisticated tracking technologies across third-party websites.[43]

80.    Quora provides website operators with advertising and analytics tools, including the Quora Pixel, Quora Ads Manager, and third-party tracking integrations. These tools enable website operators to track visitor behavior, measure advertising performance, and build targeted advertising audiences based on detailed user profiles.[44]

81.    The Quora Pixel comprises two distinct components that work in tandem to comprehensively track user behavior: the Base Pixel and the Event Pixel. The Base Pixel must be installed "on every page of your website, usually into the header code," where it measures all website traffic and enables the creation of what Quora calls "Website Traffic Audiences."[45]

82.    This Base Pixel is mandatory for all tracking functionality and serves as the foundation for Quora's surveillance capabilities.

83.    The Event Pixel operates as a second layer of tracking, installed on specific pages or elements where conversion events occur, such as thank-you pages, order confirmation pages, or inline action events like "Add to Cart" buttons.[46]

84.    Website operators can install multiple Event Pixels throughout their websites to track various user actions, creating a comprehensive map of user behavior and interactions.

---

[43]    *The Quora Pixel*, https://go.quoraforbusiness.com/rs/384-CMP-465/images/Quora_Pixel.pdf

[44] *Id.*

[45] *Id.*

[46]    *About the Quora Pixel*, https://quoraadsupport.zendesk.com/hc/en-us/articles/115010303387-About-the-Quora-Pixel

17

**CLASS ACTION COMPLAINT**

85.    When users interact with websites containing Quora Pixels, these tracking tools capture extensive data about their activities.

86.    The Pixel allows website owners to identify how many people are visiting their website and what actions they are taking, transmitting this information back to Quora's servers in real-time.[47]

87.    This tracking occurs regardless of whether users have Quora accounts or have ever visited Quora's platform.

88.    Quora's tracking extends far beyond anonymous behavioral data.

89.    For example, its Advanced Match technology allows website operators to transmit personally identifiable information directly to Quora. Advanced Match enables the "passback [of] hashed user emails to Quora's system" to identify users even "when a cookie is not present."[48]

90.    This feature is specifically designed to circumvent privacy protections and track users across multiple devices and browsing sessions.

91.    Like other major advertising platforms, Quora employs a dual-layer identification system that enables tracking of both Quora account holders and individuals who have never used the platform.

92.    For users logged into Quora accounts, the platform's pixels automatically identify them through cookies that match "website visitors and their conversions to Quora users," immediately linking their browsing activity across third-party websites to their Quora profiles.[49]

---

[47]    *Advanced Match*, https://quoraadsupport.zendesk.com/hc/en-us/articles/360039502671-Advanced-Match

[48] *Id.*

[49] *Id.*

**CLASS ACTION COMPLAINT**

93. Quora also tracks non-Quora users' web activity. For example, its Advanced Match technology captures emails, phone numbers, and other information whenever users interact with forms containing email fields on websites where the Quora Pixel with Advanced Match is deployed, typically without any disclosure to users that their email addresses will be shared with Quora's advertising platform.[50]

94. The website operator first captures the user's unhashed email address through the Pixel's code, which then intercepts and transmits this information to Quora where it is used to "better match your conversion events to Quora users."[51]

95. Quora's third-party tracking capabilities extend across multiple advertising formats and placements, supporting "Text, Image and Promoted Answer ads in Feed and Question page placements."[52]

96. Website operators can even "wrap their trackers in more than one tag," layering multiple tracking technologies to maximize data collection from visitors.[53] The exact scope and nature of the information collected and transmitted to Quora will depend on how a website operator configures the pixel.

97. The platform's reliance on cookies for user matching is extensive. As Quora admits, "The Quora Pixel uses cookies to match website visitors and their conversions to Quora users."[54]

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Advanced Match*, https://quoraadsupport.zendesk.com/hc/en-us/articles/360039502671-Advanced-Match

19

**CLASS ACTION COMPLAINT**

98.   However, recognizing that "there are scenarios where a cookie is not present," Quora has developed multiple mechanisms to continue tracking users who may be using privacy-protecting browsers or have cleared their cookies.[55]

99.   Like other tracking pixels, Quora's surveillance technology operates invisibly to users.

100.  The tracking pixels are "1x1 transparent image[s]" that are "invisible to users" and embedded in websites without any visible indication to visitors.[56]

101.  This invisible nature means that tracking "often allows pixels to operate without users' knowledge, which prevents them from consenting or opting out."[57]

102.  Quora's own documentation confirms that troubleshooting pixel installation requires checking "the code for that site" directly, as the pixels themselves provide no visible indication of their presence to website visitors.[58]

103.  Users visiting websites with Quora Pixels installed have no way of knowing their behavior is being monitored, their email addresses are being collected, or their data is being transmitted to Quora's servers for advertising purposes.

104.  The combination of Quora's dual-layer pixel architecture, advanced user identification mechanisms, third-party integrations, and invisible tracking creates a comprehensive surveillance system that operates without user knowledge or consent.

---

[55] *Id.*

[56] *Tracking Pixels: What They Are & How They Work in 2025,* https://improvado.io/blog/what-is-tracking-pixel

[57] *Tracking pixel vs. cookie: What's the difference?,* https://www.techtarget.com/whatis/feature/Tracking-pixel-vs-cookie-Whats-the-difference

[58] *Quora Pixel - Setup and Troubleshooting,* https://business.quora.com/resources/quora-pixel-explained/

**CLASS ACTION COMPLAINT**

## III. WEBSITE USERS' PRIVATE INFORMATION IS INTERCEPTED BY THE TRACKING TOOLS IN THE WEBSITES WITHOUT USERS' CONSENT.

105.  Defendants maintain and own the Websites and have made the conscious and intentional decision to install the Tracking Tools within the Websites.

106.  When users visit either website to seek products from Aios and Fella Medical, Defendants allow Twitter and Quora, among others possible third parties, to intercept and to collect all user interactions-including responses to sensitive health screening questions-in real-time.

107.  Individuals who visit the Websites are not immediately presented with the option to create an account and do not pass a link to any terms of use, privacy policy or any other page where tracking activities are disclosed.

108.  For example, upon accessing the Fella Website, the user is immediately presented with the screens below.



109. As the above images show, users are presented with prominent "Get Started" and "Take the Quiz" buttons, which lead users directly to an assessment quiz.

**CLASS ACTION COMPLAINT**

110. Users are then directed to an onboarding quiz wherein they must answer questions on sensitive health topics, examples of which are reproduced below:

LOSE WEIGHT OR GET ALL YOUR MONEY BACK

Start ———— Preliminary ———— Health ———— Details ———— Eligibility

Fella

## A Slow Metabolism is not your choice.

GLP-1 Medication will fix your metabolism so your body burns fat easily.

See if you qualify for medical weight loss just by answering a few questions.

Which of these is your priority? *

○ Lose Weight

○ Gain Muscle

○ Maintain My Current Body

NEXT →

LOSE WEIGHT OR GET ALL YOUR MONEY BACK

Start ———— Preliminary ———— Health ———— Details ———— Eligibility

Fella

**Men experience unique effects from weight gain.**

Do you experience any of the following? *

○ Low Libido    ○ Hair Loss    ○ Skin Problems

○ Brain Fog / Trouble Focusing    ○ None of these

NEXT →

22

**CLASS ACTION COMPLAINT**

111. Users are required to input their email and phone number before completing the quiz.

112. When a user finishes this quiz, text representing the user's answers to each of these questions is transmitted to each of Twitter and Quora, among other trackers present on the Website.

113. The screenshots below are exemplars that reflect the tracking that Plaintiff and class members were subject to when they visited either of the Websites and took the intake quiz.

23

**CLASS ACTION COMPLAINT**

114. Some of the several sensitive communications are highlighted in the screenshots below, along with the user's email address, name, and phone number (which have been redacted for privacy purposes).

https://analytics.twitter.com/i/adsct?bci=3&dv=America%2FChicago%26en-US%2Cen%26Google%20Inc.%26MacIntel%26127%261512%26982%2610%2630%261512%26944%260%26na&eci=2&event_id=ee81776d-d479-4d5d-b276-9da5f6c4ed6d&events=%5B%5B%22completeregistration%22%2C%7B%7D%5D%5D&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=1102d4ec-f0b8-4941-9bef-02c10022b988&tw_document_href=https%3A%2F%2Fwww.fellahealth.com%2Fyour-plan-promo-br%3Feffects_from_weight_gain%3Dhair_loss%26body_type%3Dbell_shaped%26main_reason_option%3Dfeel_better_day_to_day%26feet%3D6%26inches%3D1%26lbs%3D250%26hours_of_sleep%3Dless_than_7%26state%3Dar%26conditions%3Dnone%26prescribed%3D%26day%3D6%26month%3Dapr%26year%3D1992%26side_effects_from_new_medication%3Dsometimes%26constitutional_symptoms%3Dneutral%26weight_loss_goal%3Dlose_50_plus%26stress_levels%3Dmoderately%26ethnicity%3Dwhite_or_caucasian%26gender%3Dmale%26pregnant%3D%26activity_level%3Dmoderately_active%26diagnosed%3Dnone%26surgeries%3Dno%26weight_loss_surgeries%3D%26glp1_medication%3Dnever%26medication_supplements%3Dno%26allergies%3Dno%26allergic_to_following%3D%26drug_dose_duration%3D%26heart_rate%3D80_89%26how_disruptive%3Dmoderately_disruptive%26goal_weight%3D180%26interested_in_a_personalized_treatment_plan%3Di_am_not_sure%26first_name%_____6last_name%_____6email%3_____%26phone%_____%26completed_personalized_flow%3Dtrue%26coupon%3DFELLA100%26quiz_url%3Dhttps%3A%2F%2Fwww.fellahealth.com%2Ffella-quiz-promo-br&tw_iframe_status=0&tw_order_quantity=0&tw_sale_amount=0&txn_id=o6c2z&type=javascript&version=2.3.33

https://q.quora.com/_/ad/acfbb54d04ee44408e84672c4833fc2a/pixel?j=1&u=https%3A%2F%2Fwww.fellahealth.com%2Fyour-plan-promo-br%3Feffects_from_weight_gain%3Dhair_loss%26body_type%3Dbell_shaped%26main_reason_option%3Dfeel_better_day_to_day%26feet%3D6%26inches%3D1%26lbs%3D250%26hours_of_sleep%3Dless_than_7%26state%3Dar%26conditions%3Dnone%26prescribed%3D%26day%3D6%26month%3Dapr%26year%3D1992%26side_effects_from_new_medication%3Dsometimes%26constitutional_symptoms%3Dneutral%26weight_loss_goal%3Dlose_50_plus%26stress_levels%3Dmoderately%26ethnicity%3Dwhite_or_caucasian%26gender%3Dmale%26pregnant%3D%26activity_level%3Dmoderately_active%26diagnosed%3Dnone%26surgeries%3Dno%26weight_loss_surgeries%3D%26glp1_medication%3Dnever%26medication_supplements%3Dno%26allergies%3Dno%26allergic_to_following%3D%26drug_dose_duration%3D%26heart_rate%3D80_89%26how_disruptive%3Dmoderately_disruptive%26goal_weight%3D180%26interested_in_a_personalized_treatment_plan%3Di_am_not_sure%26first_name%_____%26last_name%_____26email%3_____gmail.com%26phone%3D_____%26completed_personalized_flow%3Dtrue%26coupon%3DFELLA100%26quiz_url%3Dhttps%3A%2F%2Fwww.fellahealth.com%2Ffella-quiz-promo-br&tag=DwellTime&ts=1756409598469&i=gtm&dwt=173987&ive=blur

115. As the screenshots above show, these pixels capture PHI and with the unique identifiers that users provide through the quiz process and transmit this data to Quora and Twitter. Therefore, individuals who take the quiz are tracked and uniquely identified whether they have preexisting accounts with Twitter or Quora or not.

116. Whether the text of the question on the page or the page identifier is transmitted, a user's answer to the question will be transmitted alongside the record of that user having viewed the page.

24

**CLASS ACTION COMPLAINT**

117. At no point in the quiz process is the user presented with any disclosure, either explicit or constructive, that third party trackers are present on the Website to record answers to these highly sensitive questions.[59]

### REPRESENTATIVE PLAINTIFF'S EXPERIENCE

118. Plaintiff Harvey Brenneise currently resides (and all times herein relevant has resided) in Sedro-Woolley, Washington.

119. In or around October 2024, Plaintiff accessed the fellahealth.com to seek weight loss treatment.

120. During this visit, Plaintiff Brenneise completed the initial quiz process, which required him to input Private Information including information regarding previous surgeries, weight loss goals, preexisting health conditions, alongside personal information like his full name, email address, and home address.

121. Plaintiff's Private Information was transmitted to Twitter, Quora, and likely other third parties as a result of Defendants' having installed these technologies on the Websites.

122. At no point before or during this process was Plaintiff Brenneise provided with any notice or means to consent (*i.e.*, a link to Defendants' terms of use or privacy policy) to his answers being recorded. Nor was he provided with any notice that this recording was taking place.

123. Plaintiff Brenneise did not click on, view, or otherwise access any hyperlinks to Defendants' terms of use, privacy policy, or any similar page during the visit.

---

[59] The Fella Health website (www.fellahealth.com and the Delilah website (www.joindelilah.com) operate in the same way with respect to intake questions, information tracked, and disclosures to users.

### CLASS ACTION COMPLAINT

124. Plaintiff Brenneise had not checked any box, clicked any button, or taken any other affirmative action indicating consent to be recorded or to have communications intercepted by Twitter, Quora, or any other third party when he took the quiz.

125. Plaintiff Brenneise was unaware at the time that his information was being intercepted in real time and disclosed to third parties such as Twitter and Quora.

126. Had he known that Defendants were using technologies to record his answers to sensitive questions, Plaintiff Brenneise would not have used Defendants' service.

127. As a result of Defendants' conduct, Plaintiff Brenneise's privacy rights were violated, and Plaintiff Brenneise suffered harm in the form of loss of control over his Private Information, increased anxiety due to unknown parties accessing sensitive data, loss of the benefit of the bargain in keeping or exchanging his private data, and other harms related to the undisclosed and non-consenting transmission of Private Information.

## CLASS ACTION ALLEGATIONS

128. Plaintiff, on behalf of himself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following classes:

**<u>The Nationwide Class</u>:**

> All individuals who used either of the Websites and had their electronic communications containing personal health information intercepted and transmitted to third parties without their knowledge or consent.

**<u>The Washington Subclass</u>:**

> All individuals who, while residents of Washington, used either of the Websites and had their electronic communications containing personal health information intercepted and transmitted to third parties without their knowledge or consent

129. The following people are excluded from either Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and any

26

**CLASS ACTION COMPLAINT**

entity in which Defendants or their parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from either Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendants' counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

130. Plaintiff reserves the right to revise or amend the Class definitions based on the discovery of new information.

131. **Numerosity:** The exact number of members of the Class is unknown but, upon information and good faith belief, it is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Class can be readily identified through Defendants' records and objective criteria and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

132. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff *and* the members of the Class sustained damages arising out of Defendants' wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendants' uniform illegal conduct.

133. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with or are antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

134. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class Members and those questions

27

**CLASS ACTION COMPLAINT**

predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to the following:

    a. Whether Defendants violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*;

    b. Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

    c. Whether Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 632;

    d. Whether Defendants violated the Washington Privacy Act, RCW 9.73.030, *et seq.*;

    e. Whether Defendants violated the My Health, My Data Act, RCW 19.373, *et seq.*;

    f. Whether Defendants' use of third-party tracking technologies is an unauthorized interception of electronic communications;

    g. Whether Defendants unlawfully intercepted and manipulated user communications;

    h. Whether Defendants were unjustly enriched by collecting and monetizing class members' protected health information;

    i. Whether Defendants' practices violated healthcare privacy laws and regulations

    j. Whether Defendants were unjustly enriched by intercepting class members' communications;

    k. Whether Defendants' representations on the Websites were deceptive;

    l. Whether Plaintiff and Class Members are entitled to damages and injunctive relief.

135. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including

**CLASS ACTION COMPLAINT**

that class-wide adjudication will provide a realistic means for members of the Class to receive monetary relief; the monetary relief suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

136. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendants aided and abetted the interception of electronic communications without consent in violation of CIPA;

b. Whether Defendants' use of embedded software constitutes an interception of communications under CIPA;

c. Whether Defendants obtained proper consent before recording users' interactions with the Websites or recording Users' information through the Websites;

d. Whether Defendants' actions violated Website visitors' reasonable expectations of privacy;

e. Whether Defendants' collection of personal and medical information through tracking technology constitutes an invasion of privacy under the California Constitution; and

137. Finally, all members of the proposed Class are readily ascertainable as Defendants have access to Class Members' names, emails and physical addresses.

29

**CLASS ACTION COMPLAINT**

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631, *et seq.*
### *(On Behalf of Plaintiff Brenneise & the Nationwide Class)*

138. Plaintiff Brenneise repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

139. Plaintiff Brenneise brings this claim individually and on behalf of the members of the Class against Defendants.

California Penal Code § 631(a) establishes liability for any person who:

[I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

[W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

[U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

[A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

The California courts have consistently held that Section 631(a) is not limited to traditional telephone communications but applies broadly to modern electronic communications, including those transmitted via the Internet. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (holding CIPA applies to Internet communications).

**CLASS ACTION COMPLAINT**

140. The California courts have specifically recognized that the use of software code to intercept and record a user's website communications, without the user's knowledge or consent, can constitute a violation of CIPA. *See, e.g., Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. 2021); *Javier v. Assurance IQ, LLC*, No. 20-16700, 2022 WL 1744107 (9th Cir. May 31, 2022).

141. The technologies embedded on the Websites constitute a "machine, instrument, contrivance, or … other manner" within the meaning of Section 631(a). This technology is specifically designed to intercept and record electronic communications between website and app users and the websites and apps they visit.

142. At all relevant times alleged herein, by implementing and using tracking technology on their website, Defendants:

    a. Intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and Class Members on the one hand, and the Websites on the other hand;

    b. Willfully and without the consent of all parties to the communications, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members while those communications were in transit or passing over wires, lines or cables;

    c. Used the information obtained through such unauthorized interception for their business purposes, including marketing optimization and lead generation; and

    d. Aided, agreed with, employed, and conspired with third parties including Twitter and Quora to implement tracking technology and to accomplish the unauthorized interception of communications.

143. Plaintiff Brenneise and Class members did not consent to any of Defendants' actions in implementing or using any tracking technology to intercept their communications through the Websites. Specifically:

31

**CLASS ACTION COMPLAINT**

a. Defendants never obtained express consent from Plaintiff or Class members before intercepting their communications;

b. Defendants began intercepting communications immediately upon a user's visit to the Websites, before any opportunity to review terms of service or privacy policies;

c. Users were not presented with either Defendants' Terms of Use or Privacy Policy during the initial survey process;

d. Defendants never provided clear, conspicuous notice that users' interactions with the Websites would be recorded in their entirety and shared with a third party;

e. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures were inadequate to inform users of the actual scope and nature of the interception.

144. The information intercepted includes sensitive personal data provided in the context of seeking healthcare - a transaction that by its nature involves the disclosure of private information.

145. Unless enjoined and restrained by this Court, Defendants will continue to commit these illegal acts. Plaintiff continues to desire to use the internet, including potentially the Fella Health Website, to search for information about and shop for healthcare. However, Plaintiff has a reasonable fear that their communications will continue to be intercepted without their consent if they visit the Websites again.

146. Pursuant to Cal. Penal Code § 637.2, Plaintiff Brenneise and Class members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendants from continuing their unlawful conduct;

b. Statutory damages of $5,000 per violation; and

c. Any other relief the Court deems proper.

32

**CLASS ACTION COMPLAINT**

147. Plaintiff Brenneise and the Class members have suffered loss by reason of these violations, including but not limited to violation of their right to privacy.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632, *et seq.*
### *(On Behalf of Plaintiff Brenneise & the Nationwide Class)*

148. Plaintiff Brenneise repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

149. Plaintiff Brenneise brings this claim individually and on behalf of the members of the Class against Defendants.

150. California Penal Code Section 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

151. California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

152. The communications between Plaintiff Brenneise and Class members and the Websites constitute "confidential communications" within the meaning of Section 632(c) because:

33

**CLASS ACTION COMPLAINT**

153. Defendants intentionally used an electronic recording device to eavesdrop upon and record these confidential healthcare communications.

154. The Twitter and Quora pixels embedded on the Websites constitute an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

155. Defendants intentionally implemented and activated this recording technology within the Websites with full knowledge that it would capture and record users' confidential healthcare communications, including their responses to sensitive health screening questions.

156. Defendants' recording of Plaintiff Brenneise's and Class members' confidential healthcare communications was accomplished without the consent of all parties to the communication, specifically:

   a. Plaintiff and Class Members never consented to having their confidential healthcare communications recorded by third-party analytics companies;

   b. Defendants never obtained express consent before implementing the recording technology;

   c. Users were not informed that their healthcare communications would be recorded and transmitted to Twitter and Quora, among others;

   d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential medical communications;

   e. The recording began immediately upon entering the quiz section of the Websites, before users had any opportunity to review privacy policies or provide informed consent.

157. Defendants' conduct was undertaken intentionally and with knowledge that third parties would record confidential healthcare communications without proper consent from all parties.

34

**CLASS ACTION COMPLAINT**

158. The confidential communications that were unlawfully recorded include highly sensitive protected health information that individuals provided with reasonable expectations of medical confidentiality and HIPAA protection.

159. As a direct and proximate result of Defendants' violations of Section 632, Plaintiff Brenneise and Class members have suffered harm including invasion of their privacy rights, violation of medical confidentiality, and loss of control over their sensitive health information.

160. Unless enjoined and restrained by this Court, Defendants will continue to commit these violations. Plaintiff Brenneise and Class members have a reasonable fear that their confidential healthcare communications will continue to be unlawfully recorded if they use telehealth services through Defendants' platform.

161. Pursuant to California Penal Code Section 637.2, Plaintiff Brenneise and Class members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendants from continuing their unlawful recording of confidential healthcare communications;

b. Statutory damages of $5,000 per violation;

c. Punitive damages for Defendants' willful and egregious violations of medical privacy; and

d. Any other relief the Court deems proper.

162. Plaintiff Brenneise and Class members seek all available remedies under California Penal Code Section 632 and related provisions for Defendants' unlawful recording of confidential healthcare communications.

35

**CLASS ACTION COMPLAINT**

## THIRD CAUSE OF ACTION

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C § 2510, *et seq.***
***(On Behalf of Plaintiff Brenneise & the Nationwide Class)***

163. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

164. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants.

165. The ECPA protects both the sending and receipt of communications.

166. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

167. A violation of the ECPA occurs where any person:

intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

168. ECPA also holds that:

[A] person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

18 U.S.C. § 2511(3)(a).

169. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

36

**CLASS ACTION COMPLAINT**

170. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

171. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

172. Whenever Plaintiff and Class Members interacted with the Websites and completed the onboarding quizzes thereon, Defendants, through the tracking technologies they embedded in the Websites, contemporaneously and intentionally intercepted the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, and redirected such contents to Twitter and Quora, among other unauthorized third parties, each of which is a third party other than an addressee or intended recipient of such communication.

173. Whenever Plaintiff and Class Members interacted with the Websites, Defendants contemporaneously and intentionally divulged the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission third parties other than an addressee or intended recipient of such communication, including Twitter and Quora.

174. Defendants intentionally intercepted and used the contents of Plaintiff's and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiff's and Class members' health-related communications by transmitting the contents to Twitter and Quora, among other third parties, for marketing analytics and behavioral targeting purposes.

175. Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of sharing the sensitive health information contained therein with third parties such as Twitter and Quora.

**CLASS ACTION COMPLAINT**

176. Defendants' interception and disclosure of Plaintiff's and Class members' electronic communications containing protected health information ("PHI") violates HIPAA's criminal provisions, specifically 42 U.S.C. § 1320d-6, which makes it a crime to knowingly and in violation of HIPAA obtain or disclose individually identifiable health information.

177. Defendants intercepted Plaintiff's and Class members' electronic communications for purposes other than providing healthcare services to Plaintiff and Class Members without authorization or consent and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

178. Defendants' interception of Plaintiff's and Class members' electronic communications was undertaken in furtherance of and to facilitate the commission of the crime of unlawful disclosure of protected health information under 42 U.S.C. § 1320d-6.

179. As a direct and proximate result of Defendants' violation of the ECPA, Plaintiff and Class Members were damaged by Defendants' conduct in that:

   a. Defendants harmed Plaintiff's and Class members' interest in privacy;

   b. Sensitive and confidential health information that Plaintiff and Class Members intended to remain private between them and their healthcare provider is no more;

   c. Defendants eroded the essential confidential nature of their relationship to the Websites' users;

   d. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

**CLASS ACTION COMPLAINT**

e. Plaintiff and Class Members did not get the full value of the healthcare services for which they paid or sought, which included Defendants' duty to maintain confidentiality; and

f. Defendants' actions diminished the value of Plaintiff's and Class members' personal health information.

180. Plaintiff, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE WASHINGTON PRIVACY ACT
### RCW 9.73.030, *et seq.*
### *(On Behalf of Plaintiff Brenneise & the Washington Subclass)*

181. Plaintiff Brenneise repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

182. Plaintiff Brenneise brings this claim individually and on behalf of the members of the Washington Subclass against Defendants.

183. The Washington Privacy Act, RCW 9.73.030, provides that it is unlawful for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, or record any private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals without first obtaining the consent of all parties to such private communication.

184. RCW 9.73.030(1)(b) further prohibits any person from using any device to intercept, record, or divulge any private communication unless all parties to the communication have consented.

39

**CLASS ACTION COMPLAINT**

185. A "private communication" under RCW 9.73.030 means any oral, wire, or electronic communication uttered or transmitted by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation.

186. At all relevant times, Plaintiff was a resident of Washington State and engaged in private communications while located in Washington.

187. Plaintiff visited www.fellahealth.com while located in Washington State.

188. During these visits and interactions, Plaintiff engaged in private communications with Defendants, including but not limited to: entering personal health information, completing medical questionnaires, submitting prescription requests, and transmitting other Private Information.

189. Plaintiff had a reasonable expectation of privacy in these communications, particularly given the sensitive healthcare nature of the information and Defendants' representations regarding privacy and confidentiality.

190. At all relevant times, Defendants intentionally intercepted, recorded, and/or divulged Plaintiff's private communications using tracking pixels and other tracking codes, among other possible electronic surveillance devices embedded on their Websites

191. Specifically, Defendants deployed tracking technologies that captured and transmitted Plaintiff's keystrokes, form entries, page visits, health information, and other private communications to third parties, including but not limited to Twitter and Quora.

192. Defendants intercepted, recorded, and divulged these private communications without obtaining Plaintiff's consent, without obtaining the consent of all parties to the communications, and without Plaintiff's knowledge.

193. Defendants' interception and recording of Plaintiff's private communications was willful, intentional, and knowing.

40

**CLASS ACTION COMPLAINT**

194.  As a direct and proximate result of Defendants' violations of RCW 9.73.030, Plaintiff has suffered damages including invasion of privacy, loss of confidentiality of sensitive health information, emotional distress, and other harm.

195.  Pursuant to RCW 9.73.060, Plaintiff is entitled to the greater of one hundred dollars per day for each day of violation or one thousand dollars ($1,000).

196.  Pursuant to RCW 9.73.060, Plaintiff is entitled to reasonable attorney fees and costs.

197.  Plaintiff is also entitled to punitive damages and such other relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE MY HEALTH, MY DATA ACT
### RCW 19.373, *et seq.*
### *(On Behalf of Plaintiff Brenneise & the Washington Subclass)*

198.  Plaintiff Brenneise repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

199.  Plaintiff Brenneise brings this claim individually and on behalf of the members of the Washington Subclass against Defendant Aios.

200.  Plaintiff Brenneise brings this claim individually and on behalf of the members of the Washington Subclass against Defendant Aios, in the alternative to the Third Cause of Action *supra,* insofar as this claim is predicated on Defendant Aios being a HIPAA-covered entity or business associate.

201.  The Washington My Health, My Data Act ("MHMDA"), RCW 19.373, *et seq.*, became effective March 31, 2024, and establishes comprehensive protections for consumer health data.

202.  The MHMDA was enacted to protect Washington consumers' most sensitive health information from unauthorized collection, use, and disclosure. The Act strictly prohibits regulated entities from collecting, processing, sharing, or selling

41

**CLASS ACTION COMPLAINT**

any consumer health data without first obtaining valid, informed consent from the consumer.

203. The law specifically addresses the growing practice of websites and online services surreptitiously harvesting health information through tracking technologies and sharing it with third-party advertisers, data brokers, and technology platforms.

204. RCW 19.373.100(8)(a) defines "consumer health data" as "Consumer health data" means ".... personal information that is linked or reasonably linkable to a consumer and that identifies the consumer's past, present, or future physical or mental health status."

205. RCW 19.373.100(23) defines "regulated entity" as "any legal entity that: (a) Conducts business in Washington or produces or provides products or services that are targeted to consumers in Washington; and (b) alone or jointly with others, determines the purpose and means of collecting, processing, sharing, or selling of consumer health data."

206. RCW 19.373.100(1)(b)(i) expressly excludes from the definition of "regulated entity" any "covered entity or business associate governed by the privacy, security, and breach notification rules" under HIPAA, and applies to entities that handle sensitive health data despite disclaiming liability under HIPAA.

207. Defendant Aios is a "regulated entity" under RCW 19.373.010(23) because it conducts business in Washington through its websites www.fellahealth.com and www.joindelilah.com, targets services to Washington consumers including Plaintiff Brenneise, and determines the purpose and means of collecting, processing, sharing, and selling consumer health data.

208. At all relevant times, Plaintiff Brenneise and members of the Washington Subclass were Washington residents and "consumers" as defined by RCW 19.373.010(7).

**CLASS ACTION COMPLAINT**

209. Through the Websites' onboarding quiz, Defendant Aios collected consumer health data from Plaintiff Brenneise and members of the Washington Subclass, including information regarding previous surgeries, weight loss goals, preexisting health conditions, weight management needs, and requests for GLP-1 medications—all of which constitute "consumer health data" under RCW 19.373.010(8)(a).

210. Defendant Aios shared and sold Plaintiff Brenneise's and Washington Subclass members' consumer health data to third parties including Twitter and Quora through embedded tracking pixels and other tracking technologies on the Websites, without obtaining valid consent as required by RCW 19.373.020(c).

211. RCW 19.373.030 prohibits regulated entities from collecting, processing, sharing, or selling any consumer health data except with valid authorization from the consumer or as otherwise permitted under the statute.

212. Defendant Aios failed to obtain valid authorization from Plaintiff Brenneise and members of the Washington Subclass before collecting, processing, sharing, or selling their consumer health data, as they were never presented with any disclosure, consent mechanism, privacy policy, or terms of use before or during the quiz process.

213. As a direct and proximate result of Defendant Aios's violations of the MHMDA, Plaintiff Brenneise and members of the Washington Subclass suffered damages including invasion of privacy, loss of control over their consumer health data, and the unauthorized disclosure of their sensitive health information to third parties.

214. Under RCW 19.373.090, "[a] violation of this chapter is not reasonable in relation to the development and preservation of business, and is an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the consumer protection act, chapter 19.86 RCW."

**CLASS ACTION COMPLAINT**

215. Because Defendant's violation of the MHMDA constitutes an unfair or deceptive business practice under Pursuant to RCW 19.86.020, Plaintiff Brenneise and members of the Washington Subclass are entitled to actual damages or statutory damages of $7,500 per violation, whichever is greater, treble damages, injunctive relief, and reasonable attorney fees and costs.

## SIXTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (*On Behalf of Plaintiff Brenneise & the Nationwide Class*)

216. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

217. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants.

218. Defendants have been unjustly enriched at the expense of Plaintiff and Class Members through their unauthorized collection, use, and monetization of their protected health information and personal data.

219. Plaintiff and Class Members conferred a benefit upon Defendants by providing valuable protected health information, including sensitive health data, medical histories, and personal identifiers, through their use of the Website.

220. Individual health records command premium prices in data markets, valued as much as 50 times more than credit card information due to their comprehensive nature and permanence.

221. Health information commands exceptional value due to its predictive power and marketing utility.

222. Defendants received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' protected health information to Twitter and Quora, among other third parties, through embedded technology without authorization or consent.

**CLASS ACTION COMPLAINT**

223. Defendants have been unjustly enriched through several mechanisms:

a. Data Monetization: Defendants derive commercial value from sharing users' protected health information with third-party analytics companies like Twitter and Quora for marketing analytics, behavioral targeting, and user profiling purposes;

b. Cost Avoidance: Defendants avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable health data;

c. Competitive Advantage: Defendants gained unfair competitive advantages by leveraging detailed health data profiles to optimize their platform and marketing without bearing the costs associated with compliant data collection.

d. Enhanced Platform Value: The unauthorized collection of comprehensive user health data increases the overall value and effectiveness of Defendants' telehealth platform.

224. Defendants obtained this benefit through unlawful interception and unauthorized disclosure of protected health information in violation of HIPAA, ECPA, CIPA, and/or the Washington Privacy Statute.

225. Plaintiff and Class Members provided this valuable information in the context of seeking confidential healthcare services with a reasonable expectation of privacy and HIPAA compliance. Defendants actively concealed their data collection and sharing practices from users who were unaware their health information was being intercepted and monetized despite marketing itself as a "HIPAA-compliant" healthcare service.

226. Defendants' retention of these benefits violates fundamental principles of fairness and equity, as Defendants have profited from the unauthorized exploitation of some of the most sensitive and valuable personal information—protected health

45

information—without providing any compensation or benefit to the individuals whose privacy was violated.

227. Plaintiff and Class Members have no adequate remedy at law for Defendants' unjust enrichment, as they cannot recover the specific value of their appropriated health data through traditional damages calculations.

228. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendants have obtained through the unauthorized collection and use of their protected health information.

229. Plaintiff and Class Members seek judgment requiring Defendants to disgorge all profits, benefits, and value obtained through their unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Harvey Brenneise, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendants Aios, Inc., and Fella Medical, P.A. and in favor of Plaintiff and the Classes, and grant the following relief:

A.   Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B.   Enter a judgment finding that Defendants' actions, as described herein, violate the Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq.*), Invasion of Privacy Act (Cal. Penal Code § 631 *et seq.*)**,** Washington Privacy Act, RCW 9.73.030, *et seq.*, and My Health, My Data Act, RCW 19.373 *et seq.*;

C.   Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Class including:

**CLASS ACTION COMPLAINT**

i.  An order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.  An order requiring Defendants to implement proper notice and consent mechanisms before using tracking technology;

iii.  An order requiring Defendants to destroy all data collected through unlawful monitoring practices.

D.  Award statutory damages of $5,000 for each violation of Cal. Penal Code § 631;

E.  Award statutory damages to Plaintiff and the Class under the Electronic Communications Privacy Act, 18 U.S.C. § 2520(c)(2), in the amount of the greater of $100 per day for each day of violation or $10,000 per violation, or actual damages and any profits made by Defendants, whichever is greater;

F.  Award statutory damages to Plaintiff and the Washington subclass under the Washington Privacy Statute, RCW 9.73.030 *et seq.* in the amount of the greater of $100 per day for each day of violation or $1,000 per violation, or actual damages and any profits made by Defendants, whichever is greater;

G.  Award statutory damages to Plaintiff and the Washington subclass under the My Health My Data Act, RCW 19.373, *et seq.*, in the amount of $7,500 per violation or treble actual damages, whichever is greater;

H.  Award restitution and disgorgement of Defendants' unjust enrichment, including all revenue derived from their unlawful business practices;

I.  Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

J.  Award Plaintiff and the Class pre- and post-judgment interest to the extent allowable and

K.  Award such other and further relief as equity and justice may require.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury for all issues so triable.

Dated: November 13, 2025

Respectfully submitted,

*/s/ Matthew J. Langley*
Matthew J. Langley (SBN 342286)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354
matt@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel.: (708) 437-6476
david@almeidalawgroup.com

*pro hac vice application* forthcoming

*Attorneys for Plaintiff & the Putative Classes*

**CLASS ACTION COMPLAINT**